Public Employee Labor Relations Board
No. 97-279

# APPEAL OF SAU #16 COOPERATIVE SCHOOL BOARD

## (New Hampshire Public Employee Labor Relations Board)

October 14, 1998

*Hatfield, Moran & Barry, P.A.*, of Hillsborough (*Douglas S. Hatfield* on the brief and orally), for the petitioner, SAU #16 Cooperative School Board.

*James F. Allmendinger*, of Concord, staff attorney, NEA-New Hampshire, by brief and orally, for the respondent, Exeter Education Association, NEA-New Hampshire.

HORTON, J. The petitioner, SAU #16 Cooperative School Board (cooperative board) appeals the decision of the New Hampshire Public Employee Labor Relations Board (PELRB), which determined that the newly formed Exeter Regional Cooperative School District (cooperative district) is bound by the pre-existing collective bargaining agreement (CBA) between the Exeter School Board and the Exeter Education Association (EEA). We affirm in part and reverse in part.

The EEA is the certified bargaining agent for all "professional employees," including teachers, employed by the Exeter School Board in the Exeter School District and represents approximately 260 teachers and personnel throughout the district. Of these

employees, approximately 155 were employed for the sixth grade, the junior high school, and the high school, and are affected by the establishment of the cooperative district. The Exeter School Board and the EEA entered into a CBA, effective September 1, 1996, to August 31, 1999.

The towns of Brentwood, East Kingston, Kensington, Newfields, and Stratham (AREA towns) sent their students to the Exeter School District for grades seven through twelve pursuant to Authorized Regional Enrollment Area agreements (AREA agreements), *see* RSA ch. 195-A (1989). Students in grades seven and eight attended the Exeter AREA Junior High School, while students in grades nine through twelve attended the Exeter AREA High School.

In March 1996, voters in Exeter and the AREA towns approved a proposal to convert from AREA agreements for grades seven through twelve to a cooperative district for grades six through twelve, effective July 1, 1997. *See* RSA 195:18 (1989 & Supp. 1997) (amended 1996); RSA 195-A:15, I (1989). The cooperative agreement provides for students in grades six through eight from Exeter and the AREA towns to attend a cooperative middle school, and grades nine through twelve a cooperative high school. The cooperative district agreed to purchase the high school and the junior high school from the Exeter School District, including the land, buildings, furnishings, and equipment.

The cooperative district is also responsible for constructing a new middle school building with an expected completion date of September 1998. Although "sixth grade education is the responsibility" of the cooperative district, sixth grade students will be housed, transported, and supported by their respective local school districts until the new middle school is complete. The cooperative district's continued existence was conditioned upon voter approval for financing a new cooperative middle school building by Exeter and the AREA towns prior to March 31, 1997, which occurred on November 9, 1996.

The cooperative agreement required the cooperative board to offer employment to all teachers teaching grades six through twelve in the pre-existing school districts. Consequently, all of the approximately 155 teachers and other professional employees represented by the EEA and all of the approximately nine and one-half sixth grade teachers from the AREA towns were employed by the cooperative board, effective July 1, 1997. Thus, approximately ninety-five percent of the cooperative district's professional staff

were previously employed by the Exeter School District, which was a party to the CBA at issue.

On July 2, 1997, the EEA filed a petition for declaratory judgment with the PELRB concerning whether the cooperative district is bound by the CBA that existed before the Exeter School District converted into the cooperative district. After a hearing, a PELRB hearing officer determined that the cooperative district "will be bound by the terms of the existing CBA between the Exeter School District and the Exeter Education Association" because the cooperative district was substantially identical as an employer to the Exeter School District and the continuance of the CBA maintains stability of the employment relationship between the parties. The hearing officer further determined that his decision "pertains only to the continuation of the CBA involving the Exeter Education Association and the preeminent role of its employees in the [cooperative district]. It does not apply to the other local districts." The cooperative board appealed for reconsideration by the full PELRB board pursuant to New Hampshire Administrative Rule, Pub 205.01(a), which provides in part:

> Any party to a hearing may apply for reconsideration by the board by filing an Appeal from Decision of Hearing Examiner within 30 days of the filing of that decision. The appeal shall set out a clear and concise statement of the grounds for the appeal or request for reconsideration.

On March 21, 1997, in a one-page decision, the PELRB affirmed the hearing officer's decision and denied the cooperative board's motion for reconsideration. Without filing a motion for rehearing of the PELRB's order in accord with RSA 541:4 (1997), the cooperative board appealed to this court.

We first address the procedural posture of this appeal. RSA 541:4 precludes an appeal from an administrative agency decision to this court by a party who has not applied for a rehearing before the agency. See Appeal of White Mts. Educ. Ass'n, 125 N.H. 771, 774, 486 A.2d 283, 286 (1984). This requirement is grounded in the sound policy that "[a]dministrative agencies . . . have a chance to correct their own alleged mistakes before time is spent appealing from them." Appeal of Conservation Law Foundation, 127 N.H. 606, 632, 507 A.2d 652, 670 (1986).

New Hampshire Administrative Rule, Pub 205.02, entitled "Motion for Rehearing," states in part:

> (a) Any party to any proceeding before the board, including an appeal under Pub 205.01, may apply for rehearing in

respect to any matter determined in that proceeding or included in that decision and order within 20 days after the board has rendered its decision and order by filing a Motion for Rehearing under RSA 541:3.

(Emphasis added.) *But see* RSA 541:3 (1997) (amended in 1994 to extend time from twenty days to thirty days). This court ordered the parties to address whether this appeal "should be dismissed for failure to file a motion for rehearing within 30 days after the board issued its March 21, 1997, order." In its brief, the cooperative board argues that a party who loses before a hearing officer and the PELRB need not file a second motion for reconsideration because to do so would be a futile exercise and would not promote judicial economy, *cf. Wilson v. Read*, 74 N.H. 322, 323, 68 A. 37, 38 (1907), and an additional motion for reconsideration could prejudice its case by not incorporating all grounds for appeal in a single motion, *see Petition of Ellis*, 138 N.H. 159, 161, 636 A.2d 62, 63 (1993). In addition, the cooperative board argues that the lack of clarity in the administrative rules should not prejudice its good faith attempt to comply with them. The EEA argues that a second motion for reconsideration is a "procedural precondition to the appeal petition and a substantive limitation on the content of the appeal petition," and that the parties "are without the power to waive the requirements of either the statute or the rules."

■ While the cooperative board failed to comply with the procedural requisite of filing a motion for rehearing of the PELRB's order, we decline to dismiss this appeal under the circumstances of this case. *See Appeal of White Mts. Educ. Ass'n*, 125 N.H. at 775, 486 A.2d at 286. The PELRB summarily affirmed the hearing officer's decision without offering any additional reasoning and denied the cooperative board's motion for reconsideration. The cooperative board erroneously, but perhaps not unreasonably, assumed that its motion for reconsideration of the hearing officer's decision to the PELRB satisfied the requirements of RSA 541:4.

■ We take this opportunity to clarify that when a party's motion for reconsideration of a hearing officer's decision is denied by the PELRB, the moving party must still apply for rehearing to satisfy the requirements of RSA 541:4 because a reconsideration motion relates to errors of the hearing officer while a rehearing motion relates to errors by the PELRB. *See* RSA 541:4; *Shaw v. City of Manchester*, 118 N.H. 158, 160, 384 A.2d 491, 493 (1978). "In the future when a record does not demonstrate that the appealing

party has met the requirements of [RSA 541:4] we will refuse the appeal or dismiss it on our own motion." *Appeal of White Mts. Educ. Ass'n*, 125 N.H. at 775, 486 A.2d at 286.

We now turn to the merits. On appeal, the cooperative board argues that the PELRB erroneously: (1) found that the cooperative district was a "successor" to the Exeter School District because there is "substantial continuity of identity" between the two; (2) imposed a pre-existing CBA on voters who have not approved the CBA's cost items; and (3) undermined the public policy of encouraging cooperative school districts. We treat the PELRB's findings of fact as *prima facie* lawful and reasonable, and its order prevails "in the absence of a clear showing of unreasonableness or illegality." *Appeal of Sanborn Regional School Bd.*, 133 N.H. 513, 521, 579 A.2d 282, 286 (1990); *see* RSA 541:13 (1997).

We first address whether the cooperative district is bound by the CBA under the successor employer analysis. The general rule that an ordinary contract does not bind unconsenting successors to a contracting party "is not true of a collective bargaining contract which is intended to regulate all the aspects of the complicated relationship between employer and employees." *American Fed'n Local 298 v. City of Manchester*, 116 N.H. 665, 667, 366 A.2d 874, 876 (1976).

> An important purpose of collective bargaining agreements is to avoid industrial strife between employers and employees by establishing terms governing the employment relationship. These are terms to which both parties have agreed, and it is the understanding and expectation of the parties that they will both respect and be bound by these terms.

*Id.* at 666, 366 A.2d at 876. We have previously held that a CBA covering, *inter alia*, wages and hours, promotions and transfers, causes for discharge, seniority, grievance procedures, annual vacations, and other topics governing the employment relationship will continue in force and bind a successive employer "if the circumstances warrant it, when there is a substantial continuity of identity in the enterprise before and after a change in employers." *Id.* at 667, 366 A.2d at 876. A previously negotiated CBA should bind a successor employer because

> [w]here there is little change in the employment relationship, such continuity furthers the expectations of the parties to the collective bargaining agreement and is

desirable in that it maintains the stability of the employment relationship between the parties.

*Id.; see* Laws 1975, 490:1.

The cooperative board suggests that we adopt a bright line test to establish when a new employer is a successor entity bound by the terms of a previously negotiated CBA. We decline that invitation. We agree with the United States Supreme Court's reasoning that

we must necessarily proceed cautiously, in the traditional case by case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of [legislative] guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate.

*Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 256 (1973); *see American Fed'n Local 298,* 116 N.H. at 667, 366 A.2d at 876.

■ Factors we consider in determining whether a new entity is a successor employer include substantial similarity in the employed workforce, continuity of management, services provided to the public, identity of the public served, core job skills required, and physical plant or equipment to perform the organization's functions. *See Scott O/B/O/N.L.R.B. v. Pacific Custom Materials,* 939 F. Supp. 1443, 1450-51 (N.D. Cal. 1996); 48A AM. JUR. 2D *Labor and Labor Relations* § 2976, at 352-53 (1994). *See generally* Annotation, *CBA — When Later Employer Bound,* 88 A.L.R. FED. 89 (1988). We also consider, from an employee's perspective, whether the former employer survives the change. *See Howard Johnson Co.,* 417 U.S. at 257. Further, some courts rely heavily "on the percentage of the predecessor's employees hired by the successor employer." *Boeing Co. v. International Ass'n of Mach. & Aero. Wkrs.,* 504 F.2d 307, 319 (5th Cir. 1974), *cert. denied,* 421 U.S. 913 (1975). While this factor may be persuasive, it is not conclusive and must be considered along with other factors. *See id.* at 321.

In *Hollis/Brookline Cooperative Support Staff Association/NEA-NH & a. v. Hollis/Brookline Cooperative School,* No. 91-31 (PELRB June 1, 1991), the PELRB determined that a cooperative board was bound by a previously negotiated CBA after the school district converted from an AREA agreement to a cooperative district. In that matter, the PELRB noted many appropriate factors, namely: offers of employment to the current

teaching staff, operations in the same facilities, education of the same student population, and continuity of management.

First, we consider the percentage of the former employer's employees retained by the successor employer. The cooperative agreement required the cooperative district to offer employment to all teachers teaching in grades six through twelve in the pre-existing school districts. As a result, *all* teachers of grades six through twelve from the Exeter School District were offered employment by the cooperative district. In addition, the cooperative district will employ *all* sixth grade teachers of the various local school districts. *See Howard Johnson Co.*, 417 U.S. at 258 (noting that the "surviving [entity] hired *all* of the employees of the disappearing [entity]").

Second, we consider the continuity of management. With the exception of replacing the retiring superintendent, the cooperative district has the same supervisory and administrative personnel as did the Exeter School District for grades seven through twelve.

Third, we consider the similarity of facilities. With the exception of an unfinished new middle school building, the teachers teach the same classes in the same buildings as when employed by the Exeter School District.

Fourth, we consider the public served. In this case, there is perfect symmetry between the communities that participated in the AREA agreements and the communities participating in the cooperative district. In the cooperative district, the AREA towns, which previously sent tuitioned students to the Exeter School District, now have a vote in the governance and administration of the cooperative district. The only difference is the inclusion of sixth grade students in the cooperative district.

The cooperative board places great weight on the addition of the sixth grade teachers and students to the cooperative district. The cooperative board argues that the conversion from a junior high to a middle school through addition of sixth grade students will lead to changes in educational policy and curriculum. Absent a substantial modification to the employment terms as expressed in the CBA at issue, the addition of one grade and changes in educational policy and curriculum from the Exeter School District to the cooperative district do not constitute a change in the terms and conditions of employment, *see* RSA 273-A:1, XI (1987); *cf. Appeal of City of Nashua Bd. Educ.*, 141 N.H. 768, 774, 695 A.2d 647, 651 (1997); *Appeal of State of N.H.*, 138 N.H. 716, 722-23, 647 A.2d 1302, 1306-07 (1994). Further, no provision in the CBA prevents the cooperative district from formulating curriculum or educational policy.

Lastly, we consider whether the successor assumed all or substantially all of the services, functions, or programs of the predecessor. Upon formation, the cooperative district assumed exclusive control of educating all students for grades seven through twelve from the Exeter School District, and all sixth grade students from Exeter and the AREA towns. The Exeter School District relinquished responsibility for teaching students in grades six through twelve, and the other five AREA towns relinquished responsibility for educating their sixth grade students, to the cooperative district.

■ While the cooperative board correctly argues that the cooperative district is a new entity, *see* RSA 195:5, :6 (1989) (amended 1996), the district is not so significantly different that the former school district's employees, management, and educational services for junior and senior high school students cannot be identified. While the cooperative district provides expanded educational services to a larger student population, it is built on the same nucleus of EEA teachers and junior high and high school students from Exeter and the AREA towns. Based on the facts of this case, administrative restructuring from AREA agreements to a cooperative district did not significantly change the employees' working conditions. Accordingly, the additional nine and one-half teachers are not significant enough to destroy the "substantial continuity" between the Exeter School District and the cooperative district, since that relates to the expanded educational services offered by the cooperative district.

■ We next address the cooperative board's argument that it should not be bound by the CBA because AREA towns never ratified its cost items. *See Sanborn,* 133 N.H. at 520, 579 A.2d at 285. Parties to a public sector CBA are not bound by its cost items unless the legislative body ratifies them. RSA 273-A:3, II(b) (1987). Ratification of cost items occurs only if the legislative body approves them with "full knowledge" of their terms. *Sanborn,* 133 N.H. at 520, 579 A.2d at 286. "The party alleging ratification must, at a minimum, demonstrate that the legislative body knew of the cost items' financial implications at the time it approved them." *Appeal of Alton School Dist.,* 140 N.H. 303, 312, 666 A.2d 937, 943 (1995).

■ It is apparent that when voting to convert the AREA agreements to a cooperative district, the AREA towns voters were apprised of the extent of the financial burden by the tuition costs under the AREA agreements. Prior to the cooperative agreement, all AREA towns paid tuition to the Exeter School District to educate

their junior high and high school students. After the conversion from an AREA agreement to a cooperative district, the same personnel (formerly employed by the Exeter School Board and now by the cooperative board) render the same services to students in the same communities within the AREA agreement and the cooperative district. Absent approval of the cooperative agreement, voters in the AREA towns would have continued to be bound to pay the costs of the CBA as incorporated in the tuition paid to Exeter School District under the AREA agreements. Under the facts of this case, the AREA towns impliedly ratified the cost items within the CBA when they approved the cooperative district proposal as a matter of law. *See Sanborn*, 133 N.H. at 520, 579 A.2d at 286. When the identical communities in an AREA agreement vote to convert to a cooperative district, and the cooperative district is a successor employer, the voters implicitly ratify the cost items within the existing CBA that is binding on the successor employer. *See* RSA 195:6, I (Supp. 1997).

■ Lastly, with respect to the cooperative board's third argument, we are not persuaded that our holding today will discourage creation of cooperative school districts. In fact, the record shows that the cooperative district's witness testifying before the PELRB could not identify any provision in the CBA that interferes with the cooperative district's ability to formulate curriculum or educational policy, a motivating factor for entering into cooperative school districts. *See* RSA 195:5 (Supp. 1997) (granting cooperative school boards the same powers and duties as local school boards).

■ We hold that all employees within the bargaining unit of the successor cooperative district are covered by the terms of the previously negotiated CBA. As a matter of law, it was erroneous for the PELRB to exclude the nine and one-half teachers from the AREA towns. As we noted in *American Fed'n Local 298*, some alterations must be made after a successor employer assumes operations for its predecessor. *See American Fed'n Local 298*, 116 N.H. at 668, 366 A.2d at 877. In this case, the addition of the sixth grade teachers from the AREA towns by the transformation from a junior high school to a middle school is one such change. Based on our review of the record, this change was a prerequisite, if not the underlying motivation, for approval of the cooperative district. Therefore, the bargaining unit must be expanded by an additional

nine and one-half teachers. This minor change, however, will not materially alter the agreement. *Id.* at 668, 366 A.2d at 877.

*Affirmed in part; reversed in part.*

BRODERICK, J., sat but did not participate in the decision; the others concurred.